**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

EDWARD D. MULLINS, *et al.*,

                 **Plaintiffs,**

    - against -

**CITY OF NEW YORK and THE NEW**
**YORK CITY POLICE DEPARTMENT,**

           **Defendants.**

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/9/09

**OPINION AND ORDER**

**04 Civ. 2979 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Over 4,300 New York City police sergeants ("plaintiffs") have brought suit against the City of New York and the New York City Police Department ("NYPD") (collectively "defendants"), claiming systematic violation of their overtime rights under the Fair Labor Standards Act ("FLSA").[1] This lawsuit addresses the policies and practices of the nation's largest police department and the applicability of the FLSA to the intermediate ranks of law enforcement.

---

[1]    29 U.S.C. §§ 201-219.

1

On March 21, 2008, this Court entered a preliminary injunction ("the March 21 Injunction") restraining defendants from commencing internal affairs investigations of plaintiffs concerning statements made during the course of the litigation.[2] Defendants appealed, and on January 27, 2009, the Second Circuit remanded the case for further proceedings.[3]   For the reasons that follow, this Court leaves the March 21 Injunction in place.

## II.   BACKGROUND

### A.   Procedural History

Shortly after plaintiffs initiated this case, the parties commenced discovery pursuant to a Joint Discovery Plan, which specifically ordered the parties to conduct discovery into whether plaintiffs are exempt from FLSA overtime protections.  The December 2004 Scheduling Order further directed the parties to conduct discovery into plaintiffs' job duties.  In light of the large number of plaintiffs, the parties entered into a stipulation in May 2005 agreeing to identify test plaintiffs from sixteen job categories – organized into three groups – so that discovery could proceed expeditiously and according to staggered deadlines.

---

[2]   This Court entered an Amended Opinion and Order on April 9, 2008. *See Mullins v. City of New York*, 554 F. Supp. 2d 483 (S.D.N.Y. 2008), *remanded*, 307 Fed. App'x 585 (2d Cir. 2009).

[3]   *See Mullins v. City of New York*, 307 Fed. App'x 585 (2d Cir. 2009).

2

The first group of test plaintiffs consisted of six job categories of sergeants from two departments. Following the close of discovery concerning the first group of sergeants, the parties cross-moved for summary judgment concerning whether plaintiffs are exempt from FLSA protections. On November 6, 2007, this Court denied plaintiffs' motion and granted defendants' motion in part.[4]  The Court then conducted a five-day jury trial to resolve the remaining disputed issue of fact, namely whether plaintiff sergeants' "'suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.'"[5]  On July 18, 2008, the jury answered in the affirmative. Finally, on October 17, 2008, this Court denied plaintiffs' renewed motion for judgment as a matter of law and motion for a new trial.[6]

Although the July 18 verdict placed the first six categories of

---

[4]     *See Mullins v. City of New York*, 523 F. Supp. 2d 339 (S.D.N.Y. 2007).

[5]     *Id.* at 359 (quoting 29 C.F.R. § 541.100).

[6]     *See Mullins v. City of New York*, No. 04 Civ. 2949, 2008 WL 4620709 (S.D.N.Y. Oct. 17, 2008). On December 18, 2008, this Court granted defendants' motion for reconsideration of the October 17 Opinion and Order but adhered to the original decision. *See Mullins v. City of New York*, No. 04 Civ. 2949, 2008 WL 5329313 (S.D.N.Y. Dec. 18, 2008).

3

sergeants outside the ambit of the FLSA, the claims of numerous categories of

sergeants remain unresolved.  In order to facilitate appeal, plaintiffs' attorneys are

currently seeking the approval of the remaining ten categories of sergeants to a

stipulated judgment that would apply the November 6, 2007 Opinion and Order

and the July 18, 2008 verdict to all plaintiffs.[7]

## B.    Collection of Information Concerning Deposition Testimony

In January 2006, defendants' lead outside counsel – Lorie Almon of

Seyfarth Shaw LLP – met with Charles Campisi, Chief of the NYPD  Internal

Affairs Bureau ("IAB"), and several other NYPD officials to discuss deposition

testimony.  On January 19, Seyfarth Shaw sent transcripts of test plaintiffs'

depositions to defendants.[8]   The next day, the NYPD sent IAB lieutenants to

NYPD commands to collect command logs, memo books, activity reports,

overtime slips, and requests for leave reports from the test plaintiffs.[9]  Although

plaintiffs' counsel had been notified the previous month of defendants' intent to

---

[7]     *See* 3/27/09 Letter from Gregory K. McGillivary, plaintiffs' attorney, to the Court, Pl. Hearing Ex. 4.

[8]     *See* 3/4/08 Declaration of Lorie E. Almon, defendants' attorney, ¶¶ 2-3.

[9]     *See* April 2009 Preliminary Injunction Hearing Transcript ("Tr.") at 20:14-21:17, 23:12-23:23.

4

gather documents related to the test plaintiffs,[10] they were not warned of the date of collection or that collection would be carried out by IAB.[11]

Plaintiffs' counsel immediately objected to the use of IAB to collect plaintiffs' documents, writing to defense counsel, "While some plaintiffs figured out after several anxious hours that the document collection pertained to the F.L.S.A. lawsuit, many of these individuals believed, and many are still concerned, that the IAB's involvement means that they are under investigation by the Police Department."[12] Numerous plaintiffs also communicated concerns to officials of the Sergeants Benevolent Association ("SBA"), plaintiffs' union.[13] At least a portion of plaintiffs who were asked for documents were not told why the documents were being collected, leading to speculation and concern.[14] Individual plaintiffs expressed concern that the involvement of IAB indicated that plaintiffs were under investigation or that the City intended to retaliate against them for their

---

[10]    *See* 1/23/06 Letter from Almon to McGillivary, Def. Hearing Ex. 7.

[11]    *See* 1/20/06 Letter from McGillivary to Almon, Pl. Hearing Ex. 1.

[12]    *Id.* at 2.

[13]    *See* Tr. at 27:15-30:2.

[14]    *See id.* at 114:10-115:10.

5

participation in this lawsuit.[15]

Document collection from sergeants is generally conducted by administrative lieutenants or integrity control officers ("ICOs") assigned to a particular command.[16]   Although IAB officers occasionally collect documents from officers,[17] in most cases IAB only becomes involved if an officer is being arrested or is the subject of a disciplinary investigation.[18]   The involvement of IAB led plaintiffs to believe that an investigation was beginning, which could result in severe penalties.[19]

## C.   Delay of Sergeant Edward Scott's Plea Bargain

As it turns out, plaintiffs' belief that IAB had begun to investigate them was accurate.   On March 16, 2006, Sergeant Edward Scott's ICO appeared at Scott's scheduled deposition.[20]   Ordinarily, ICOs review integrity issues within a

---

[15]   *See id.* at 26:25-28:24, 114:10-19, 127:2-15.  *See also* 1/21/06 e-mail from Brian J. Coughlan to Paul Capotosto, SBA City-Wide Secretary (describing the IAB document collection from "active participants in the FLSA suit" as "Goon Tactics").

[16]   *See* Tr. at 113:18-114:4.

[17]   *See* 1/23/06 Letter from Almon to McGillivary.

[18]   *See* Tr. at 132:10-14.

[19]   *See id.* at 115:5-10.

[20]   *See* 4/16/09 Declaration of Edward Scott ("Scott Decl.") ¶¶ 13-14.

command – such as time sheet protocol and report preparation – and would not become involved in a civil lawsuit.[21]  Although plaintiffs' counsel objected to the presence of an ICO, defendants insisted that Scott's ICO remain at the deposition.[22]

On March 11, 2008, Scott inquired into the status of a plea agreement he had entered concerning an unrelated charge of conducting personal business while on department time.[23]  Scott learned that the plea agreement had not been referred to the NYPD Commissioner, a necessary condition to resolution of a patrol guide violation by plea bargain.[24]  Scott had been eligible to retire since January 28, 2008, after twenty years of service.[25]  Although the NYPD cannot stop an officer from retiring,[26] there are negative consequences to filing a retirement application with pending charges: either the charges will not be

---

[21]     See id. ¶ 16.

[22]     See 4/4/06 Letter from McGillivary to Almon, Def. Hearing Ex. 12, at 4.

[23]     See Scott Decl. ¶¶ 19, 21, 28.  See also 4/23/09 Declaration of Julie L. Schwartz ("Schwartz Decl."), Deputy Commissioner, NYPD, ¶ 30 (describing Sergeant Scott's negotiated proposed plea agreement).

[24]     See Scott Decl. ¶ 28.

[25]     See id. ¶ 25.

[26]     See Schwartz Decl. ¶ 32.

7

addressed and the officer will not retire in good standing or the charges will be

addressed via an expedited trial. In either case, the officer loses the possibility of

a lenient plea bargain.[27]

The plea agreement had been deliberately delayed because Scott was

under IAB investigation for making false statements in his 2006 deposition in this

case.[28]  As Scott believed that the delay constituted retaliation for participating in

the FLSA lawsuit, he contacted an SBA representative to express his desire to

drop out of the instant suit.[29]  Although the City-Wide Secretary of the SBA

convinced Scott to remain in this suit until plaintiffs' attorneys could address the

delay, several other plaintiffs spoke with Scott to express their concern. Some

sergeants stated that the investigation and delay – which they viewed as retaliatory

– made them consider dropping out of the lawsuit as well.[30]  Some time after this

Court entered the March 21 Injunction, Scott's plea agreement was forwarded to

---

[27]     *See* Scott Decl. ¶¶ 23-24, 31; Schwartz Decl. ¶¶ 27, 33.

[28]     *See* Schwartz Decl. ¶ 34.

[29]     *See* Scott Decl. ¶¶ 32-37.  *But see* Schwartz Decl. ¶ 40 (stating that the IAB investigation would not have been closed if Scott had withdrawn from this lawsuit).

[30]     *See* Scott Decl. ¶¶ 39-43.

8

the NYPD Commissioner, who accepted the plea on May 21.[31]  Scott retired that

same day.[32]  After entry of the preliminary injunction and resolution of the delay in

processing his plea bargain, Scott chose to remain in the case.[33]

### D.    Interrogation of Sergeant Anthony Cioffi

Sergeant Anthony Cioffi gave deposition testimony in connection

with this lawsuit on November 15, 2005.[34]  Over a year later – in December 2006 –

IAB Lieutenant Patrick Diecidue reviewed the transcript of Cioffi's deposition and

concluded that Cioffi had made false statements under oath.[35]  Although the

allegations were noted in Cioffi's personnel file,[36] no actions were taken at the

time, and Cioffi in fact received a promotion to sergeant specialist.[37]

On February 11, 2008 – fourteen months after the IAB review of

Sergeant Cioffi's deposition transcript but a mere two months after this Court held

---

[31]    *See id.* ¶ 47; Schwartz Decl. ¶ 41.

[32]    *See* Schwartz Decl. ¶ 42.

[33]    *See* Scott Decl. ¶ 46.

[34]    *See* 3/4/08 Declaration of Patrick Diecidue, IAB Lieutenant, ¶¶ 3-4.

[35]    *See id.*

[36]    *See* Schwartz Decl. ¶ 47.

[37]    *See* Tr. at 99:12-100:1.  It is not clear from the record if the
promotion occurred before or after Diecidue reviewed the deposition transcript.

that disputed issues of fact necessitated trial – Cioffi received a letter summoning

him to appear the next day at the office of Chief Charles Campesi of IAB to

submit to an interrogation as part of an investigation into "his apparent violations

of NYPD rules and regulations."[38]  At the interrogation – known as a "GO-15" –

Lieutenant Diecidue informed Cioffi that Seyfarth Shaw LLP had lodged

allegations of perjury and false statements, both violations of the NYPD patrol

guide.[39]  Although Cioffi's attorney objected to the GO-15 as impermissible

retaliation under the FLSA, Cioffi proceeded with the interrogation in light of the

NYPD policy that any officer refusing to answer IAB questions is subject to

immediate suspension and discipline.[40]

During the interrogation – which lasted approximately four hours –

Sergeant Cioffi was questioned about specific responses given at his deposition,

which the IAB interrogators referenced by page and line number from the

---

[38]     2/12/08 Letter from Andrew C. Quinn, plaintiffs' attorney, to Almon,
Pl. Hearing Ex. 24A.  This was an unusual and high-profile location for an IAB
interrogation. *See* Tr. at 39:16-40:6.

[39]     *See* Transcript, In the Matter of Sgt. Anthony Cioffi, Case # 8394569
("GO-15 Tr.") at 6:1-4, Pl. Hearing Ex. 53.

[40]     *See id.* at 6:8-21.

deposition transcript.[41]  The interrogators asked Sergeant Cioffi to explain his

responses,[42] often rephrasing or reiterating the deposition questions,[43] posing

hypotheticals,[44] and occasionally commenting on Sergeant Cioffi's responses[45] or

informing Cioffi of his duties and obligations before posing questions concerning

those same subjects.[46]  Among his explanations, Cioffi stated that the difference

---

[41]     *See, e.g., id.* at 116:21-23 ("LT. DIECIDUE: [Line] 5: 'Your team
does not produce results[,] there is absolutely no consequence to you as a
sergeant?' [Line] 7: 'To me, no.  We do what we can.'  Would there [be]
consequences if your team does not produce?").

[42]     *See, e.g., id.* at 58:6-13 ("LT. DIECIDUE: Can you explain – this is
your testimony, correct?  SGT. CIOFFI: Yes.  LT. DIECIDUE: Can you explain
what you meant when you responded this way?").

[43]     *See, e.g., id.* at 70:2-5 ("LT. DIECIDUE: [Line] 21, Question: 'Do
you review the computer generated reports?'  Answer: 'Review them?  No.  At
times, I look them over, but I don't review them.'  Can you explain what you mean
by your statements here?  You're asking, you're asked if you review them.  Do
you review reports?").

[44]     *See, e.g., id.* at 87:1-2 ("LT. DIECIDUE: Would you tell a cop, a
uniformed cop or one of your cops to stand there on that crime scene when you go
out and look for the bad guy?").

[45]     *See, e.g., id.* at 94:13-14 ("LT. MICHAEL DORSEY: Okay.  Because
your answer to me sounds like you're demeaning yourself here and in this whole
sense now."); *id.* at 86:1-4 ("LT. DIECIDUE: Your answer is saying again, not
taking charge of a crime scene.  SGT. CIOFFI: Right.  LT. DIECIDUE: Why
would you say that?").

[46]     *See id.* at 68:20-69:7 ("LT. DIECIDUE: Sergeant, as people as police
officers we have obligations.  As supervisors, as a sergeant, you have obligations[.
A]s a lieutenant, I have obligations.  All right, feelings and stuff, they don't get in

between certain responses given at his deposition and those given at the GO-15 could be attributed to the distress as well as "duress" that he felt at points during the deposition.[47] Sergeant Cioffi also represented that he did not feel such distress or duress at the interrogation and – as a result – that his responses could now be regarded as more accurate.[48]

Despite his statements during the interrogation, Cioffi told his SBA delegate that he had felt intimidated during his GO-15 and remained concerned that he would be demoted or incur some other penalty.[49] Within days of the interrogation, numerous sergeants had either called union representatives to

---

the way too much. Okay? Let's try and make that clear here, all right? The warm and fuzziness, you're a supervisor, I'm asking you a question, how'd you handle something as a supervisor. Not the warm and fuzziness of, well, it's my team and everything else, and we work together, and it's we. It's you're the sergeant, they're the officers.").

[47]    See, e.g., id. at 113:3-7 ("SGT. ANTHONY CIOFFI: Again, this was a time when [defendants' attorney] was kind of just firing off questions at me and being a little abrasive. . . . Again, this answer[,] I was probably under a little bit of duress.").

[48]    See id. at 115:20-116:8 ("LT. MICHAEL DORSEY: Sergeant, Sarge, are you under duress right now? Are you giving these answers freely? SGT. ANTHONY CIOFFI: No, I'm giving these answers freely. . . . LT. MICHAEL DORSEY: So the answers you're giving now are more accurate answers than what you previously gave? SGT. ANTHONY CIOFFI: Obviously, yes.").

[49]    See Tr. at 45:7-13, 72:17-24.

express concern or discussed the interrogation at meetings.[50]  Moreover, union

representatives discussed the interrogation with each of the approximately twenty

sergeants in Cioffi's unit.  Despite Cioffi's unwillingness to express distress

during the GO-15, concern quickly spread among NYPD sergeants.[51]

### E.    Effects of an Internal Affairs Investigation

As a general matter, NYPD officers subject to an IAB investigation

face a litany of potential harms to their careers.  *First*, an officer who refuses to

"testify or to answer questions relating to the performance of . . . official duties . . .

will be subject to department charges, which would result in . . . dismissal from the

Police Department."[52]  *Second*, a finding by IAB that an officer intentionally made

false statements subjects the officer "to disciplinary action [up to] and including

dismissal."[53]  *Third*, when an officer has reached a plea bargain concerning a

violation of the NYPD patrol guide, if the officer is subject to another open

---

[50]    *See id.* at 46:7-48:18.

[51]    *See id.* at 92:10-93:5.

[52]    GO-15 Tr. at 4:20-5:1.

[53]    *Id.* at 5:5-8.  *Accord id.* at 5:8-14 ("Intentionally making a false
official statement regarding a material matter will result in dismissal from the
Department absent exceptional circumstances. . . . Examples of circumstances in
which false statements may arise [include] but are not limited to lying under oath
during a civil . . . proceeding . . . .").

13

investigation, "the processing of the recommended plea agreement may be

delayed, withdrawn or amended while there is an independent processing of the

open investigation or charges and specifications."[54] *Fourth*, if an officer with an

open investigation files for retirement, the case will be resolved in an expedited

manner, which allows the officer to retire but precludes resolution by plea

bargain.[55] *Fifth*, IAB allegations – both substantiated and unsubstantiated –

appear in an officer's Central Personnel Index ("CPI") entry, which affects the

officer's level of discipline for future infractions and complicates an officer's

request for transfers or promotions.[56]

## F.    Ongoing Concerns

On March 5, 2008, the Court issued a temporary restraining order

enjoining defendants from:

> (1) engaging in any further investigation of Sergeant Cioffi
> relating to his testimony or participation in this case;
> (2) using plaintiff Cioffi's February 12, 2008 testimony as

---

[54]    Schwartz Decl. ¶ 13.

[55]    *See id.* ¶¶ 24-27.

[56]    *See id.* ¶¶ 46-47. Although in some cases an officer will still receive
a favorable transfer or promotion despite the presence of allegations in his or her
CPI entry, *see id.* ¶ 47; Tr. at 99:12-100:1, an officer whose CPI entry contains
charges and specifications must address them during an interview for a transfer or
promotion, even if the officer was exonerated. *See* Tr. at 134:2-13.

14

> the basis for any disciplinary action; and
> (3) investigating or disciplining any plaintiff in this matter
> based on his or her testimony or participation in this
> lawsuit.[57]

On April 10, 2008, this Court issued a preliminary injunction restraining the same

three categories of conduct.[58]  After this Court issued the preliminary injunction,

several plaintiffs that had previously discussed dropping out of the lawsuit

determined that the risk had diminished and no longer sought to withdraw their

claims.[59]

Prior to the commencement of the limited trial on July 14, 2008,

several plaintiffs who were called to testify expressed renewed concern about the

internal affairs investigation and potential repercussions of their testimony.[60]  SBA

officials specifically described the injunction to those sergeants slated to testify,

who in turn expressed relief and testified.[61]  Plaintiffs who were not a part of the

July 2008 trial have also expressed concern over the IAB investigation of Sergeant

---

[57]     Order, *Mullins v. City of New York*, 04 Civ. 2979, Docket No. 81
(S.D.N.Y. Mar. 5, 2008).

[58]     *See Mullins*, 554 F. Supp. 2d at 494.

[59]     *See* Tr. at 139:2-141:14.

[60]     *See id.* at 52:7-22.

[61]     *See id.* at 53:2-15.

Cioffi,[62] and one test plaintiff in a category that has not yet been tried stated that

he would "absolutely" consider dropping out of the case if the injunction were

lifted.[63]

### F.    Updated Proceedings

On January 27, 2009, the Second Circuit remanded this case for

clarification and further fact-finding. *First*, the Circuit requested clarification as

to whether plaintiffs' speech meets the "public concern" requirement of a public

employee's First Amendment retaliation claim.[64] *Second*, the Circuit requested

clarification of this Court's irreparable harm finding concerning the deprivation of

First Amendment rights.[65] *Third*, the Circuit requested clarification of this Court's

irreparable harm finding concerning the FLSA bar on witness intimidation.[66]

*Fourth*, the Circuit requested clarification concerning the means by which the

preliminary injunction would remedy potential irreparable harm that would occur

---

[62]    *See id.* at 116:3-24.

[63]    *Id.* at 116:10-12.

[64]    *Mullins*, 307 Fed. App'x at 586-87 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

[65]    *See id.* at 587.

[66]    *See id.*

16

in the absence of interim relief.[67] *Fifth*, the Circuit asked this Court to conduct further fact-finding in order to determine whether – "in light of developments in the case" – the preliminary injunction remains necessary.[68] *Sixth*, the Circuit asked the Court to consider whether a narrower injunction "would be sufficient to minimize or avoid any irreparable harm."[69]

On April 1 and April 8, 2009, this Court held a hearing concerning the ongoing need for the March 21 Injunction. Over defendants' objection, this Court accepted hearsay statements from sergeants with positions in the SBA with regard to concern voiced by dozens of other individually-named plaintiffs.[70] This Court accepted additional evidence from both parties in the form of declarations from plaintiff Edward Scott and Deputy Commissioner Julie L. Schwartz of the NYPD.[71] This Court had previously accepted declarations when reviewing

---

[67]     *See id.* at 587-88.

[68]     *Id.* at 588

[69]     *See id.*

[70]     *See* Tr. at 10:19-22. *See also, e.g., id.* at 27:15-29:18 (naming individual sergeants).

[71]     This Court received an additional declaration from Andrew C. Quinn, plaintiffs' attorney. *See* 4/27/09 Declaration of Andrew C. Quinn. Defendants objected to the submission of the Quinn declaration as outside the parties' agreement concerning the submission of declarations, supplementation of a closed record, and a violation of the advocate-witness rule. *See* Defendants' Proposed

plaintiffs' initial request for a preliminary injunction as well.[72]

## III.   APPLICABLE LAW

### A.   Admission of Hearsay Evidence

"[T]he Court may consider hearsay evidence in a preliminary

injunction hearing."[73]  Nevertheless, a court may weigh evidence based on whether

such evidence would be admissible under the Federal Rules of Evidence.[74]

### B.   Preliminary Injunction

---

Findings of Fact Concerning the Continuation of the Preliminary Injunction at 5
n.4.  As the Quinn Declaration merely provides clarification of information
already before the Court, it will not be considered in order to avoid advocate-
witness concerns.  *See Ramey v. District 141, Int'l Assoc. of Machinists &
Aerospace Workers*, 378 F.3d 269, 283 (2d Cir. 2004) (noting that an attorney may
be disqualified in either a representational capacity or a testimonial capacity and
aiming to avoid any disqualification).

[72]      *See, e.g.*, *Mullins*, 554 F. Supp. 2d at 492 n.50 (citing 3/4/08 Almon
Declaration).

[73]      *Zeneca Inc. v. Eli Lilly & Co.*, No. 99 Civ. 1452, 1999 WL 509471, at
*2 (S.D.N.Y. July 19, 1999).  *Accord Houdini, Inc. v. Goody Baskets LLC*, 166
Fed App'x 946 (9th Cir. 2006) ("[T]he district court did not abuse its discretion in
considering hearsay . . . because the rules of evidence do not strictly apply to
preliminary injunction proceedings." (citing, *inter alia*, *Republic of the Philippines
v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988))); *Kos Pharms., Inc. v. Andrx
Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (collecting several circuit decisions).

[74]      *See Zeneca*, 1999 WL 509471, at *2.  *See also Securities Exchange
Comm'n v. Musella*, 578 F. Supp. 425, 427-28 (S.D.N.Y. 1984) (noting that a
court need not discount hearsay evidence presented in an application for a
preliminary injunction hearing if such evidence is found to be "inherently
trustworthy").

"'The district court has wide discretion in determining whether to grant a preliminary injunction . . . .'"[75] Nonetheless, "'[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'"[76] "'A party seeking a preliminary injunction in this circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'"[77]

In addressing the merits of the "ultimate case [underlying a motion for a preliminary injunction], a court is not called upon finally to decide the merits of the controversy."[78] "A district court may enter a preliminary injunction staying

---

[75]     *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Moore v. Consolidated Edison*, 409 F.3d 506, 511 (2d Cir. 2005)). *Accord Somoza v. New York City Dep't of Educ.*, 538 F.3d 106, 112 (2d Cir. 2008) (noting that a district court decision concerning a preliminary injunction is reviewed for abuse of discretion).

[76]     *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

[77]     *County of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004)).

[78]     *Gibson v. U.S. Immigration & Naturalization Serv.*, 541 F. Supp. 131, 137 (S.D.N.Y. 1982) (citation omitted).

19

'government action taken in the public interest pursuant to a statutory or regulatory scheme' only when the moving party has demonstrated that . . . there is a likelihood that he will succeed on the merits of his claim."[79]  However, courts have "adopted the 'serious questions' standard to an injunction directed . . . only to compel . . . defendants' compliance with federal and State law."[80]  In such cases, although the government is a litigant, "no party has an exclusive claim on the public interest."[81]

## C.    FLSA Retaliation

Section 15(a)(3) of the FLSA declares that "it shall be unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be

---

[79]      *Alleyne v. N.Y. State Educ. Dep't*, 516 F.3d 96, 101 (2d Cir. 2008) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006)). *Accord Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) ("[W]here the full play of the democratic process involving both the legislative and executive branches has produced a policy in the name of the public interest embodied in a statute and implementing regulations, our role in reviewing that determination for the purpose of deciding whether to apply the 'serious questions' or 'likelihood of success' standard is severely limited.").

[80]      *Reynolds v. Giuliani*, 35 F. Supp. 2d 331, 339 (S.D.N.Y. 1999) (citing, *inter alia*, *Carey v. Klutznick*, 637 F.2d 834 (2d Cir. 1980)).

[81]      *Haitian Ctrs. Council v. McNary*, 969 F.2d 1326, 1339 (2d Cir. 1992) (citing *Almonte v. Pierce*, 666 F. Supp. 517, 526 (S.D.N.Y. 1987)), *vacated as moot*, 509 U.S. 918 (1993).

20

instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding . . . ."[82] "To establish a prima facie case for retaliation, a plaintiff must demonstrate 'participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action.'"[83] Once a plaintiff establishs a prima facie case, "the defendant has a burden of production 'to articulate some legitimate, [non-retaliatory] reason' for the adverse action."[84]

An employment action disadvantages an employee engaged in a protected activity if a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[85] The application of preexisting disciplinary policies to a

---

[82]     29 U.S.C. § 215(a)(3).

[83]     *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (quoting *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991)).

[84]     *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 876 (2d Cir. 1988) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

[85]     *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 68 (2006) (interpreting the analogous requirement of a Title VII retaliation claim) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

plaintiff "without more, does not constitute adverse employment action."[86] However, "[a]n employee who knows that, [by pursuing a statutory claim], she risks a formal investigation a work. nd reprimand – including a threat of 'further, more serious discipline' – . . . might well choose not to proceed with the litigation in the first place."[87]

"A plaintiff can establish the causal connection between protected [activities] and an adverse employment determination indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'"[88]

### D.    First Amendment Retaliation

"Whether public employee speech is protected from retaliation under the First Amendment entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee

---

[86]    *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).

[87]    *Billings v. Town of Grafton*, 515 F.3d 39, 54-55 (1st Cir. 2008) (quoting *Burlington Northern*, 548 U.S. at 73).

[88]    *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).

22

differently from any other member of the general public.'"[89] "'Whether an
employee's speech addresses a matter of public concern is a question of law for
the court to decide, taking into account the content, form, and context of a given
statement as revealed by the whole record.'"[90] The adequate justification defense
reflects a balancing of "'the interest of the State, as an employer, in promoting the
efficiency of the public services it performs through its employees.'"[91]

"'[R]etaliation against the airing of generally personal grievances is
not brought within the protection of the First Amendment by 'the mere fact that
one or two of [a public employee's] comments could be construed broadly to

---

[89]    *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008)
(quoting *Garcetti*, 547 U.S. at 418). *Accord Garcetti*, 547 U.S. at 418 ("A
government entity has broader discretion to restrict speech when it acts in its role
as employer, but the restrictions it imposes must be directed at speech that has
some potential to affect the entity's operations."). The Second Circuit had
previously framed the inquiry as a three-pronged test. *See Skehan v. Village of
Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006) ("In order to establish a First
Amendment retaliation claim, plaintiffs must prove that: (1) they engaged in
constitutionally protected speech because they spoke as citizens on a matter of
public concern; (2) they suffered an adverse employment action; and (3) the
speech was a 'motivating factor' in the adverse employment decision." (citing,
*inter alia*, *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005))). These tests
are intended to be substantively identical. *See Ruotolo*, 514 F.3d at 188.

[90]    *Ruotolo*, 514 F.3d at 189 (quoting *Lewis v. Cowen*, 165 F.3d 154, 163
(2d Cir. 1999)).

[91]    *Piscottano v. Murphy*, 511 F.3d 247, 269 (2d Cir. 2007) (quoting
*Pickering v. Board of Educ.*, 391 U.S. 563 (1968)).

23

implicate matters of public concern.'"[92]  However, the Second Circuit has

"repeatedly held that discrimination in a government workplace is a matter of

public concern," particularly where "lawsuits concern discrimination problems

generally and were not limited to instances affecting only" a single plaintiff.[93]

### E.   Irreparable Harm

"'To satisfy the irreparable harm requirement, plaintiffs must

demonstrate that absent a preliminary injunction they will suffer an injury that is

neither remote nor speculative, but actual and imminent, and one that cannot be

remedied if a court waits until the end of trial to resolve the harm.'"[94] Moreover,

irreparable harm by definition "'cannot be remedied by an award of monetary

---

[92]     *Ruotolo*, 514 F.3d at 190 (quoting *Ezekwo v. New York City Health &
Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991)).  *Accord id.* ("A generalized
public interest in the fair or proper treatment of public employees is not enough.").

[93]     *Cotarelo v. Village of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252
(2d Cir. 2006) (citing, *inter alia,  Konits v. Valley Stream Cent. High Sch. Dist.*,
394 F.3d 121, 125 (2d Cir. 2005)).  *Accord Ruotolo*, 514 F.3d at 190 (describing
*Cotarelo* as addressing general problems with a public employer, rather than an
incident affecting only a single plaintiff).

[94]     *Grand River*, 481 F.3d at 66 (quoting *Freedom Holdings, Inc. v.
Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).

damages.'"[95] The Second Circuit has applied a "a particularly stringent standard for irreparable injury in government personnel cases."[96]

The Second Circuit has "not consistently presumed irreparable harm in cases involving allegations of the abridgement of First Amendment rights."[97] "Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed."[98] "In contrast, in instances where a plaintiff alleges injury from a rule or regulation that may only *potentially* affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury . . . ."[99]

---

[95]     *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005) (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995)). *Accord Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) ("[W]here monetary damages may provide adequate compensation, a preliminary injunction should not issue.").

[96]     *American Postal Workers Union v. U.S. Postal Serv.*, 766 F.2d 715, 721 (2d Cir. 1985).

[97]     *Bronx Household of Faith v. Board of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003). *But see Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

[98]     *Bronx Household of Faith*, 331 F.3d at 349. *Accord, e.g.*, *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) (applying a presumption of irreparable harm to a challenge to denial of a permit to conduct a photo shoot).

[99]     *Bronx Household of Faith*, 331 F.3d at 350 (emphasis added). *Accord, e.g.*, *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999)

25

Concerning FLSA claims, "[a] retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights under the Act or from providing testimony for the plaintiff in her effort to protect her own rights. These risks may be found to constitute irreparable injury."[100] There is no presumption of irreparable injury in such cases; rather the Second Circuit has adopted a "case-by-case approach to requests for preliminary relief based on witness intimidation."[101]  A preliminary injunction is appropriate when "immediate relief [is] the only form of relief that could mitigate the alleged harm of witness intimidation in the ongoing proceedings."[102]

## IV.   DISCUSSION

### A.   Hearsay Evidence

---

(holding that an alleged chilling effect caused by a policy requiring NYPD officers to notify the department of their intention to speak before a governmental agency or a private organization about department policy and to provide an after-the-fact summary of their comments was too speculative to establish irreparable harm). *See generally Laird v. Tatum*, 408 U.S. 1, 14 (1972) (holding that a cognizable claim of the chilling of First Amendment rights must articulate a "specific present objective harm or a threat of specific future harm").

[100]    *Holt v. Continental Group, Inc.*, 708 F.2d 87, 91 (2d Cir. 1983).

[101]    *Moore*, 409 F.3d 506 at n.6.

[102]    *Id.* (citing *Holt*, 708 F.2d at 91).

To begin, I again conclude that hearsay is admissible to support or to oppose an application for a preliminary injunction. A preliminary injunction is an interim remedy, and the burdensome requirements of trial testimony are at odds with its provisional purpose. Through affidavits and hearsay testimony, a court may maximize the breadth of evidence without necessitating hearings that span days or weeks.[103]   Although exigent circumstances provide an independent and supplemental justification for relaxing hearsay rules, they are not necessary for a court to admit hearsay testimony in a preliminary injunction hearing. In the instant case, the Court received the benefit of evidence of concern expressed by dozens of individually-named sergeants without the burden of a parade of witnesses and the loss of time by busy law enforcement officers.

## B.    Sufficiently Serious Question Going to the Merits

Before deciding whether plaintiffs face irreparable harm from defendants' continuing investigation of their testimony in this law suit, it is necessary to examine the nature of the claims at the root of the March 21

---

[103]    Moreover, concerns at the root of relevancy and hearsay objections apply with far lesser force when a judge serves as fact-finder, rather than a lay jury. *See Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir. 1977). *See also* 11 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 2885 ("In nonjury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence.").

Injunction. As noted earlier, in order to obtain an injunction, plaintiffs must demonstrate either "a likelihood of success on the merits" or "sufficiently serious questions going to the merits."[104] Although government defendants undoubtedly act in what they perceive to be the public interest, they are not the only litigants who pursue public ends. In this case, NYPD regulations forbid officers from testifying falsely under oath in order to maintain the integrity of the NYPD and public faith in the police.[105] However the federal government expressly forbids employers from retaliating against employees who assert their rights under the FLSA, and the First Amendment protects civic discourse by forbidding retaliation under the color of law against citizens who speak on a matter of public concern. As both parties seek to implement public-minded policies, plaintiffs need only

---

[104]     *Leavitt*, 524 F.3d at 414.

[105]     Notably, this policy does not reflect "the full play of the democratic process involving both the legislative and executive." *Able*, 44 F.3d at 131. Although the New York City Charter grants general control of the NYPD to the NYPD Commissioner, *see* N.Y. Charter § 434, the specific policy that defendants wish to promote – the investigation of any police officer's statement made under oath that a complainant asserts was false – did not result from a formal or democratic process. *Cf. Karmel v. City of New York*, 200 F. Supp. 2d 361, 365 n.2 (S.D.N.Y. 2002) (finding that a provision of the NYPD Administrative Guide "cannot be characterized as a legislative or regulatory rule implemented through a 'reasoned democratic process.'" (quoting *Able*, 44 F.3d at 131)).

28

demonstrate sufficiently serious questions going to the merits in order to warrant a preliminary injunction.[106]

### 1.   FLSA

Plaintiffs have not only demonstrated a sufficiently serious question going to the merits of a FLSA retaliation claim; they have also demonstrated a likelihood of success on the merits.  By joining this action and providing deposition and trial testimony, plaintiffs undoubtedly engaged in protected activity known to the defendants.  Moreover, as IAB specifically investigated the veracity of such testimony, the causal link between plaintiffs' protected activity and the investigations at issue are clear, and there is no need for the indirect proof typically offered in support of retaliation claims.

Whether the IAB investigations disadvantaged plaintiffs is only a marginally more difficult question.  The initiation of an official investigation of any plaintiff for false statements or lying under oath – with termination from the NYPD as a possible consequence – would deter a reasonable police officer from vigorously pursuing his or her statutory rights in court.  Testimony expressing widespread concern among plaintiffs buttressed a conclusion that could have been

---

[106]   As noted below, even if plaintiffs were required to demonstrate a likelihood of success on the merits, their showing would meet that more rigorous standard.

29

reached using common sense alone. Employees who chose to join this lawsuit,
were asked to testify, and subsequently were confronted with a line-by-line IAB
investigation into their statements faced serious potential consequences, including
direct sanctions, the loss of the procedural benefit of a plea bargain in unrelated
matters, and a permanent entry in their CPI files. Those who chose not to join the
suit faced no such consequences. Therefore, active IAB investigations constituted
an adverse action to plaintiffs.[107]

Nor have defendants articulated a non-retaliatory reason for the
adverse action.[108] Defendants first argue that plaintiffs were merely subject to

---

[107]     On the other hand, the collection of documents by IAB officers –
while an intimidating prelude to more serious action – would not have sufficed
standing alone to support a preliminary injunction. Although the use of IAB
officers to carry out this task raised the specter of full-blown investigations, that
threat alone would not have deterred a reasonable plaintiff from participating in a
FLSA lawsuit.

[108]     Even if defendants had articulated a non-retaliatory reason for the
adverse action, plaintiffs have presented many types of evidence of direct
retaliatory intent, which together create a sufficiently serious question going to the
merits of a FLSA retaliation claim. *First*, the investigations were triggered by the
City's outside counsel in this case. *Second*, Sergeant Cioffi was called in for a
GO-15 only after this Court denied in part defendants' motion for summary
judgment. *Third*, Cioffi's GO-15 was carried out in an atypical location that
supports an inference of an atypical investigation. *Fourth*, the GO-15 transcript
reveals an effort to alter the record, rather than merely investigate perjury. *See,
e.g.*, GO-15 Tr. at 115:20-116:8 (repeatedly asking whether Cioffi's deposition
testimony or GO-15 testimony was more accurate). *Fifth*, an ICO was sent to
Sergeant Scott's deposition even *before* he had provided testimony, true or false.

existing disciplinary policies that punish NYPD officers for making false statements.[109] However, the deposition testimony at issue is not the type of statement ordinarily subject to a perjury prosecution or analogous administrative proceedings.[110] Sergeant Cioffi was asked questions concerning his mind-set when he carried out certain acts,[111] distinctions between pairs of nearly synonymous terms such as "boss" and "supervisor,"[112] and duties that were not directly linked to his deposition testimony.[113] The transcript of the interrogation reveals lieutenants seeking concessions and modifications of testimony, rather than an investigation of a willful assertion of a material fact known to be false.[114] Nor is it the routine policy of the NYPD to carry out GO-15 interrogations in the

---

[109]    *See* Defendants' Conclusions of Law in Opposition to the Continuation of the Preliminary Injunction ("Def. Mem.") at 8.

[110]    *Cf. Milkovich v. Lorian Journal Co.*, 497 U.S. 1, 21 (1990) (noting that a defamation claim addressing a statement that another individual committed perjury would be "sufficiently factual to be susceptible of being proved true or false" and would "be made on a core of objective evidence").

[111]    *See, e.g.*, GO-15 Tr. at 75:11-13.

[112]    *See id.* at 53:7-54:11.

[113]    *See, e.g., id.* at 42:15-43:11.

[114]    *Cf.* 18 U.S.C. § 1621(1). The NYPD Patrol Guide provides as its sole example of a false statement "creating a false description of events" – an example of objectively verifiable facts. *See* 1/13/05 NYPD Interim Order, *Revision to Patrol Guide 203-08, "Making False Statements"*, Def. Hearing Ex. 5.

office of the head of IAB. Thus it is clear that the investigations at issue went beyond routine application of existing disciplinary policies.[115]

In the alternative, defendants argue that correction of Sergeant Cioffi's deposition testimony was necessary because his statements concerning sergeants' supervisory duties – if believed – would cause severe disruption to the operation of the NYPD.[116]   However, defendants have submitted no evidence concerning Sergeant Cioffi failing to carry out his supervisory duties. Nor have defendants provided evidence that other sergeants took heed of Cioffi's deposition and failed to perform their own duties as a result of the purportedly false testimony. Under the burden-shifting framework applicable to FLSA retaliation claims, the burden to present evidence of a non-retaliatory basis for the adverse action falls on the employer. Defendants have failed to meet this burden.

---

[115]     As the finder of fact of fact in this request for provisional equitable relief, I decline to fully credit defendants' hearsay affidavit asserting that the NYPD vigorously investigates each and every allegation of false testimony or perjury. Such a claim is simply not credible to a judge with close to twenty years of experience. My experience and that of my colleagues have been discussed in the media. *See, e.g.*, Benjamin Weiser, *Police in Gun Searches Face Disbelief in Court*, N.Y. Times, May 12, 2008 (describing the pervasive problem of "testilying" and the lack of NYPD monitoring or investigations); Anemona Hartocollis, *Officer Is Cleared in Mass Arrests at 2004 G.O.P. Convention*, N.Y. Times, Mar. 1, 2007 (describing an NYPD decision not to prosecute an inspector despite plain contradictions between sworn statements and deposition testimony).

[116]     *See* Def. Mem. at 24.

Therefore, plaintiffs have carried their burden to establish a

sufficiently serious question going to the merits of their FLSA retaliation claim.

Moreover, plaintiffs have exceeded their legal burden by demonstrating a

likelihood of success on the merits.

### 2.    First Amendment

Plaintiffs' FLSA retaliation claim is sufficient to sustain the

preliminary injunction; their First Amendment claim simply provides an

alternative basis for the provisional relief.[117] Again, although plaintiffs need only

demonstrate a sufficiently serious question going to the merits of their First

Amendment retaliation claim, they have demonstrated a likelihood of success on

the merits of this claim as well.

By testifying in this case, plaintiffs have spoken as citizens on a

matter of public concern. Plaintiffs raise claims concerning the department-wide

practices of the nation's largest police force. Their complaints are not limited to

rogue discrimination by a single supervisor or a single unlawful benefits

---

[117]    Although "principles of judicial restraint" caution "to avoid reaching
constitutional questions when they are unnecessary to the disposition of a case,"
*see Higazy v. Templeton*, 505 F.3d 161, 179 n.19 (2d Cir. 2007) (citing *Ehrlich v.
Town of Glastonbury*, 348 F.3d 48, 57 (2d Cir. 2003)), the Second Circuit's
request for clarification requires discussion of both bases for the preliminary
injunction.

33

determination. Rather, plaintiffs assert that one of the largest public sector

employers in the United States systemically violates federal labor law. Although

plaintiffs are undoubtedly self-interested employees, they also challenge a

longstanding employment practice that will affect future generations of NYPD

sergeants and may indirectly affect other police departments around the nation.[118]

Moreover, the form and context of the speech at issue – descriptions of officers'

duties and responsibilities given in depositions and on the witness stand at trial –

cries out for protection from retaliation by a government defendant in order to

secure access to the courts.[119] Allegations of officially-sanctioned and widespread

public wrongdoing remain within the protection of the First Amendment, even

when voiced by a public employee.

　　　　　Nor have defendants presented an adequate justification for their

investigation of plaintiffs. This inquiry parallels defendants' burden to produce a

non-retaliatory reason for adverse action taken against an individual who has

---

[118]　　*See* Tr. at 84:11-19.

[119]　　*See Catletti v. Rampe*, 334 F.3d 225, 230 (2d Cir. 2003) ("'[T]he
foundations of federal justice will be undermined' if witnesses are not able to
testify freely." (quoting *United States v. Pacelli*, 491 F.2d 1108, 1113 (2d Cir.
1974)). Although I "need not decide whether the trial context renders testimony a
matter of public concern regardless of its content," *id.*, because the content of the
speech alone is sufficient to place it under the protection of the First Amendment,
this context buttresses plaintiffs' claim.

34

demonstrated a prima facie case of FLSA retaliation. For the same reasons that

defendants have failed to carry their burden to demonstrate a non-retaliatory basis

for the interrogation of Sergeant Cioffi or for other interrogations they would carry

out if the preliminary injunction were lifted, they have failed to demonstrate that

the efficient function of government requires the NYPD to interrogate plaintiffs

concerning their deposition and trial testimony.

Therefore, plaintiffs have carried their burden to establish a

sufficiently serious question going to the merits of their First Amendment claim.

Moreover, plaintiffs have exceeded their legal burden by demonstrating a

likelihood of success on the merits.

## C.    Irreparable Harm

### 1.    FLSA

Absent a preliminary injunction, plaintiffs face actual and imminent

harm that cannot be remedied if this Court were to delay injunctive relief until a

final judgment is reached. Testimony at the preliminary injunction hearing

conclusively demonstrated that an officer summoned to IAB fears for his career.

Once under investigation, an officer may lose accrued benefits and possibly his or

her job. Even if the officer is acquitted, an IAB investigation is a fair subject of

inquiry when an officer seeks a favorable transfer or promotion.

35

In theory, this Court could provide ex post remedies to a portion of the harm plaintiffs would suffer in the absence of a preliminary injunction. Sergeants could be reinstated, disciplinary records could be expunged, and plaintiffs could be awarded back-pay. But not all direct effects of an IAB investigation can be remedied after the fact. This Court cannot return days, months, or years spent doing police work to a plaintiff like Sergeant Scott who cannot retire absent severe consequences during a pending investigation.[120]

More generally, the evidence presented clearly shows that absent injunctive relief numerous plaintiffs would likely (and reasonably) withdraw from this litigation rather than testify and face a line-by-line IAB interrogation and the possibility of sanction or dismissal. As described above, plaintiffs have presented evidence of substantial coercion and demonstrated a likelihood of success on the underlying claim.[121] The loss of plaintiffs' claims by coerced but "voluntary"

---

[120]     Of course a sergeant facing investigation could retire without good standing or after accepting unnecessarily harsh punishment as a result of a refusal by defendants to accept a plea bargain. This Hobson's choice is no choice to a reasonable officer, as a reasonable plaintiff who has spent twenty years as a police officer will not discard the extremely generous pension benefits offered by the NYPD. Thus the harm incurred by plaintiffs nearing retirement is not "speculative," as defendants argue. *See* Def. Mem. at 12-13.

[121]     *Cf. Savage v. Gorski*, 850 F.3d 64, 67 (2d Cir. 1988) (finding that a preliminary injunction is unwarranted absent evidence of actual coercion); *American Postal Workers Union*, 766 F.2d at 722 (holding that a preliminary

dismissal is irreparable. The FLSA anti-retaliation provision guarantees that an employee claiming inadequate compensation may testify without fear of adverse employment actions. Moreover, adjudication without the benefit of testimony that would have been provided by sergeants who have withdrawn from a lawsuit out of fear constitutes irreparable harm to the remaining plaintiffs.

### 2.   First Amendment

This is not a case where government actors have directly limited speech through a prior restraint or even a declaration that particular speech will be criminalized. Nevertheless, a clear causal link exists between defendants' conduct and the deprivation of plaintiffs' First Amendment rights. The threat of investigation is not conjectural. IAB interrogations have occurred, and – as demonstrated by defendants' opposition to the March 21 Injunction – they will be recommenced absent continuing court intervention. Nor have defendants limited their investigations to plaintiffs who made glaring and objectively false statements. Rather IAB collected documents from *every* test plaintiff, and defendants sent an ICO to Sergeant Scott's pretrial deposition in this case before he had provided *any* testimony.

---

injunction to redress witness intimidation is unwarranted absent a substantially strong showing concerning the underlying claim).

If the NYPD were permitted to interrogate each testifying sergeant, plaintiffs would be faced with the choice of modifying their testimony or risking dismissal from the NYPD. This directly harms plaintiffs' ability to speak their own version of the truth – as opposed to the government's version of the truth – concerning the employment practices of NYPD. Thus deprivation of First Amendment rights directly results from defendants' actions. In such cases plaintiffs are irreparably harmed – as is the public discourse protected by our nation's free speech guarantees. Therefore, plaintiffs have demonstrated irreparable harm to First Amendment interests sufficient to support a preliminary injunction.

### D.      Balance of Hardships

As described above, recommended NYPD interrogations would create substantial hardships for plaintiffs in the form of irreparable harms. Defendants assert that without the ability to investigate plaintiffs, they too will face substantial hardship. Defendants argue that allowing purportedly false testimony to stand for the duration of the litigation will disrupt the operations of the NYPD and undermine the public's trust in its police force. However, I decline to credit this *argument*, as defendants have presented no *evidence* to support these bald assertions.

38

Nor does the presentation of purportedly false testimony unreasonably harm defendants in this litigation.  Like every other litigant, defendants may use cross-examination to root out false statements.  The NYPD cannot assume the role of fact-finder and determine the "truth" to which a jury – and thus the public – may be exposed.  It is in "the NYPD's interest to maintain the credibility of the NYPD," and it is in the public's interest to maintain an honest police force.[122]  The NYPD may not – however – vouch for its own credibility by prejudging the testimony of its officers.  Moreover, selective investigation of the full breadth of testifying plaintiffs' statements – far beyond what is objectively verifiable or willfully false – far exceeds the goal of maintaining the integrity of the NYPD.  Therefore, the balance of hardships favors continuation of the March 21 Injunction.

### E.    Continuing Need

Although a trial has occurred, this litigation is by no means over.  Two categories of plaintiffs have not yet had their claims heard, and although plaintiffs' attorneys are attempting to convince each plaintiff to join a stipulated judgment, the attorneys' success is by no means guaranteed.  Moreover, should the Second Circuit reverse either this Court's summary judgment opinion or its

---

[122]    Def. Mem. at 23.

39

opinion denying plaintiffs' renewed motion for judgment as a matter of law and

motion for a new trial, a second trial for the first group of plaintiffs may be

necessary. It is entirely possible that new testimony will be required. If this Court

were to lift the preliminary injunction now and allow investigations and later find

a need for additional testimony, the evidence has shown that numerous plaintiffs

would likely abandon this suit rather than testify. Even if the Court were to

reinstate the preliminary injunction at a later date, it could not credibly reassure

plaintiffs that they would not face retaliation for their testimony. Therefore, the

March 21 Injunction remains necessary.

### F.    Scope of the Injunction

Although the scope of a preliminary injunction is ordinarily a matter

of discretion reserved to the district court, the Second Circuit has expressly

requested explanation of both the remedial effect of the March 21 Injunction and

whether narrower relief would suffice to achieve similar results. I will answer

each question in turn.

The nature of the harm described – as well as the individual

experience of Sergeant Scott – makes the remedial effect of the March 21

Injunction clear. At the recent hearing, plaintiffs presented substantial evidence

that numerous plaintiffs grew extremely concerned about testifying just before the

commencement of the trial concerning the first group of sergeants.  Only after

plaintiffs' attorneys explained that the preliminary injunction protected plaintiffs

from retaliatory investigations did those sergeants decide to continue with the

lawsuit.  Thus the March 21 Injunction countered the witness intimidation that

resulted from the pattern of IAB investigations.  Should this Court require further

testimony in this litigation, the continued presence of an injunction will be needed

to reassure plaintiffs that they may testify without fearing for their livelihoods.

Similarly, with the March 21 Injunction in place Sergeant Scott was

permitted to receive the benefit of a negotiated plea bargain and retire after more

than twenty years of service – albeit later than he would have retired had he never

been investigated.  Had IAB been permitted to continue its investigation, Scott

would have been unable to resolve his prior patrol manual violation by plea

bargain until IAB deemed its investigation complete, forcing him to choose

between not retiring or losing the benefit of his plea bargain.  Should

investigations be allowed to recommence, other sergeants will have open,

unsubstantiated investigations pending at the time they wish to retire.

Finally, the injunction has preserved plaintiffs' ability to tell their

version of the truth concerning the employment policies of the NYPD, a matter of

public concern.  Had each plaintiff been subject to investigation by IAB in the

41

same manner as Sergeant Cioffi, the NYPD could have pressured each plaintiff in turn to modify his testimony, just as Sergeant Cioffi agreed to modify his deposition testimony when his job was on the line. Behind closed doors, the NYPD could have established its own version of the truth, effectively binding plaintiffs to present a government-sanctioned story to the public, particularly to a jury. In a lawsuit, such determinations of the truth are left to a jury, and accusations of falsity are levied through cross examination. The imposition of the March 21 Injunction directly prevented the NYPD from imposing its version of the truth prior to plaintiffs' public testimony, preserving plaintiffs' First Amendment rights.

Nor would a narrower injunction afford similar relief. The March 21 Injunction barred all investigation and discipline of plaintiffs concerning their testimony or participation in this lawsuit. At no point would mere participation in this lawsuit be an appropriate basis for investigation or punishment. Such actions would constitute retaliation in its simplest form. While the suit remains pending, permitting investigation of particular testimony would similarly undermine the efficacy of the injunction. Defendants' ability to seek modification of plaintiffs' testimony during such an investigation – with an officer's job hanging in the balance – directly threatens First Amendment rights. Moreover, plaintiffs have

shown that active investigations provide a successful deterrent to participation in

this suit, and any narrower injunction permitting IAB investigations would likely

lead to plaintiffs abandoning this suit or refusing to testify in order to avoid a risk

to their livelihood.[123]

## V.   CONCLUSION

This ruling does not permanently enjoin defendants.  Nor does it

provide plaintiffs with carte blanche to lie under oath to this Court or to any other.

However given defendants' past behavior in this litigation and the genuine

concern expressed by plaintiffs, as long as this litigation continues, this Court will

protect plaintiffs from IAB interrogation.  Thus plaintiffs can rest assured that they

may actively participate in this case without fear of retaliation.

For the reasons set forth above, the April 12, 2008 Preliminary

Injunction remains in place.  The parties are to inform the Clerk of the United

---

[123]   That being said, once this litigation has concluded and the record is
closed, should plaintiffs prove their retaliation claim it is possible that a narrower
injunction would suffice to protect plaintiffs' First Amendment interests.  In
particular, defendants might reasonably be permitted to investigate objectively
false statements made by officers.  However, that determination is not yet timely.
Nor are plaintiffs immune from perjury charges brought through the ordinary
channels of the criminal justice system. Thus even with the March 21 Injunction in
place, plaintiffs are not free to lie under oath.

States Court of Appeals for the Second Circuit of this Opinion and Order by letter within ten days.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
         June 9, 2009

## - Appearances -

**For Plaintiffs:**

Stephen P. Younger, Esq.
Clay J. Pierce, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

Gregory K. McGillivary, Esq.
Woodley & McGillivary
1125 15th Street, Suite 400
Washington, DC 20005
(202) 833-8855

Andrew Quinn, Esq.
Quinn & Mellea
399 Knollwood Road, Suite 200
White Plains, New York 10603
(914) 997-0555

**For Defendants:**

Lorie E. Almon, Esq.
Jeremi L. Chylinski, Esq.
Robert S. Witman, Esq.
Seyfarth Shaw LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018
(212) 218-5500

James M. Lemonedes
Andrez Carberry
Assistant Corporation Counsel
100 Church Street
New York, New York 10007
(212) 788-0881